UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

FILED

2003 OCT 22  P 2: 13

US ....
P....

| | | |
|---|---|---|
| In re: | ) | Civil No. 03-MC380 (JCH) |
| | ) | |
| BRITESTARR HOMES, INC. | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | Bankruptcy Case No. 02-50811 |
| | ) | (AHWS) |
| BRITESTARR HOMES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Adv. Pro. No. 03-5072 (AHWS) |
| | ) | |
| PIPER RUDNICK, LLP, | ) | |
| | ) | |
| Defendant. | ) | October 22, 2003 |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT**

Britestarr Homes, Inc. ("Britestarr") respectfully files this Response to Defendant's

Motion to Withdraw the Reference to the Bankruptcy Court ("Withdrawal Motion").

**I.
SUMMARY OF RESPONSE**

Piper Rudnick, LLP ("Piper") asks this Court to withdraw the reference with regard

to this adversary proceeding ("Adversary Proceeding").  Piper's Withdrawal Motion should

be denied for three reasons.  First, Piper's Withdrawal Motion is not yet ripe for decision.

Second, Piper has waived its right to seek withdrawal by filing a proof of claim in the

Bankruptcy Court. Third, even if this Court decides that this issue is ripe and that Piper can

raise it, Piper's withdrawal motion should still be denied because Piper has failed to

G:\BRITESTARR\PLEADINGS\Resp to Motion to Withdraw.1.wpd

demonstrate sufficient cause for the withdrawal.  In fact, the factors that this Court should consider in deciding whether to withdraw the reference weigh heavily in favor of this case remaining in the Bankruptcy Court:

1.    <u>Core v. Non-core</u> – The Adversary Proceeding is a core proceeding because it raises compulsory counterclaims to the proof of claim filed by Piper in the Adversary Proceeding Debtor's Chapter 11 case.  In addition, the causes of action alleged in the complaint are themselves significant assets of the estate and thus constitute core proceedings.

2.    <u>Efficiency of Judicial Resources</u> – The Bankruptcy Court has consolidated the discovery in this matter with Piper's proof of claim against the Britestarr estate, making it more efficient for the case to remain a part of the bankruptcy proceeding.  Further, the Bankruptcy Court is already familiar with the underlying facts and transactions and has dealt with the parties to this suit.

3.    <u>Delay and Costs to the Parties</u> – Requiring this Court to become familiar with the underlying facts and transactions will result in a delay, and withdrawing the reference would require Britestarr and Piper to participate in litigation in two different courts.

4.    <u>Uniformity of Bankruptcy Administration</u> – Having Britestarr's claims against a creditor, related to Britestarr's only asset, decided by the Bankruptcy Court, which will administer the estate is more uniform than having two separate courts making rulings concerning the same transactions.

5.     <u>Prevention of Forum Shopping</u> – Allowing Piper to remove this case from the
Bankruptcy Court by attempting to protect <u>Britestarr's</u> right to a jury trial after
Piper has filed a claim in the bankruptcy court, is precisely the type of
procedural maneuvering that this factor was intended to stop.

## II.
## FACT SUMMARY

Britestarr was incorporated (as a Subchapter S corporation) under the laws of the
State of New York, purportedly to construct a factory to build modular housing and to sell
that housing to developers in the New York metropolitan area. Upon its formation, all of
the shares of Britestarr were issued to Friema Norkin, the then wife of David Norkin
("Norkin"), Britestarr's President. Friema Norkin is and always has been the sole owner of
all of the outstanding shares of Britestarr.

On or about September 8, 1988, Lloyds provided $4,450,000 (the "Loan") to
Britestarr to purchase approximately 28 acres of real property located at 400 Oak Point
Avenue in the Bronx, New York (the "Oak Point Site"). The Loan was secured by a
mortgage on the Oak Point Site, personal guarantees from Friema Norkin and David
Norkin, and a pledge of all of the issued and outstanding shares of Britestarr ("the
Pledge"). Lloyds retained physical possession of the share certificate.

On or about September 8, 1988, Britestarr purchased the Oak Point Site from
Consolidated Rail Corporation. The Oak Point Site was purchased for $3,167,100. As part
of the purchase agreement, Britestarr agreed to subdivide the Oak Point Site so that the
City of New York could establish a separate tax lot and block for the Oak Point Site.

In January 1989, Norkin, through his affiliated entity Oak Point Associates, began operating a construction and demolition recycling plant on the Oak Point Site. Subsequently, the New York Department of Sanitation issued an order compelling Oak Point Associates to cease its operations at the Oak Point Site. On or about August 18, 1989, the New York State Department of Sanitation claimed that 122,000 cubic yards of unprocessed construction and demolition material were located at the Oak Point Site. The Department of Sanitation suspended all deliveries to the Oak Point Site. In October 1989, the State of New York caused the processing and placement of construction and demolition material on the Oak Point Site to cease, and the State of New York commenced actions against Norkin and others. By November 13, 1989, Lloyds declared Britestarr in default on the Loan and declared all outstanding amounts owing on the Loan to be due immediately. Norkin attempted to refinance the Loan and to induce Lloyds to represent to third parties that Britestarr was not in default under the Loan.

In 1998, Norkin sought to sell the Oak Point Site to ABB Equity Ventures, Inc. ("ABB"). ABB believed that New York City's electric generation needs were acute with significant reliability issues and the highest electricity cost in the continental United States. To reduce the cost of electricity and improve reliability, particularly in the Bronx, ABB sought to develop the environmentally friendly and highly efficient Oak Point Energy Generating Facility, which would be fueled by clean-burning natural gas. The facility would have improved the air quality in the Bronx and the City of New York by displacing the generation and emissions of older and higher-polluting power plants.

The critical first step in developing such a facility was to secure suitable land on which to build the plant. For this purpose, ABB entered into an Option Agreement (the

"Option Agreement"), dated December 31, 1998, with Britestarr, as the owner of four parcels of land situated in the Borough and County of the Bronx and the State of New York, being a part of Lot 74, Block 2604 and also easements in Lot 252 and Lot 195 in Block 2604 (the " Property").   Pursuant to the Option Agreement, Britestarr granted ABB the exclusive option to purchase the Oak Point Site until December 31, 2001.  In exchange for this exclusive option to purchase the Oak Point Site, ABB was required to make a series of payments totaling $1,440,000 plus $20,000 for legal expenses.

On February 28, 2000, Piper opened a client trust account for the benefit of Britestarr.  The initial deposit was $240,000, ABB's most recent option payment.  The W-9 attached to the account application was signed by Norkin as President of Britestarr. Between February 1, 1999 and August 22, 2001, ABB, pursuant to the option agreement, paid $1,460,000 to Britestarr.  Of this amount, Piper received $1,080,000 on Britestarr's behalf.

Britestarr had two fundamental obligations under the Option Agreement: (i) it could not convey or permit the involuntary conveyance of the Property during the option period and (ii) if and when ABB exercised its option, Britestarr had to promptly deliver title to the Property free and clear of liens and encumbrances.

In early August 1999, a number of articles appearing in the New York print media concerning Norkin, Britestarr, and the Property came to ABB's attention.  Among other things, it was widely reported that Norkin and Britestarr had extensive contacts with the Gambino organized crime family and that Britestarr had operated "New York's largest illegal dumping ground" on the Property in partnership with members of the Gambino family.  According to the reports, one of Britestarr's corporate officers was a known

associate and confidant of John Gotti, Jr.  It was also reported that John Gotti, Jr. was frequently spotted at the dump site by New York City sanitation police officers who were investigating Britestarr's illegal activities.   The reports also detailed David Norkin's extensive history of being involved in illegal and highly questionable commercial transactions, including pleading guilty to bankruptcy fraud and conspiracy to bribe a Federal Judge.  It also was reported that Norkin had a "myriad of financial troubles," including legal judgments, tax liens, and numerous bankruptcy filings.

One of the most disturbing reports, however, concerned Norkin's dishonesty toward the Bronx community, which by then, ABB was actively courting.  It was reported that Britestarr had purportedly purchased the Property for the purpose of erecting a modular home factory.  Norkin had personally promised the people of the Bronx that his factory would be a step toward rebuilding a distressed community and his modular home factory, when completed and operational, would provide hundreds of jobs for the surrounding community.  The reports concluded that David Norkin did not keep any of his promises to the Bronx community and Britestarr never erected a modular home factory on the site.  Instead of jobs and growth, Britestarr's legacy to the people of the Bronx was a mountain of illegal waste, contamination, and organized crime.  Finally, it also was widely reported that while Britestarr was running an illegal dump at the Property, Norkin had collected millions of dollars in fees, all of which had "disappeared."

When ABB learned of these reports in August 1999, it immediately began its own thorough investigation to determine their precise nature and extent.  Although by then, ABB already had invested significant funds in the permitting process for the Property, ABB was alarmed that the issues exposed by the media could hinder, if not completely frustrate, its

development of the project. In particular, ABB was concerned that it would, at a minimum, face an uphill battle in securing the financing necessary to build the contemplated $800 million power generation plant on the site. Accordingly, ABB scaled back its development efforts.

ABB immediately began conducting an extensive, time-consuming investigation into Britestarr's ability to comply with its obligations under the Option Agreement. ABB's investigation uncovered a number of previously undisclosed threats to Britestarr's ability to convey the Property as required under the Option Agreement including the following: threats of foreclosure by a third party against the Property, threats from pending tax liens against the Property, and threats from Norkin's bankruptcy creditors.

As its investigation continued, ABB also came to learn an even more alarming fact: contrary to his many express assertions otherwise, Norkin was not and is not the owner of the shares of Britestarr and, therefore, might not have the authority to convey the Property to ABB. ABB learned that Norkin was not a shareholder at all. Indeed, the very ability of Britestarr to consummate the Option Agreement was called into question.

In the face of these threats and its mounting concerns about Britestarr's ability to perform its fundamental obligations, ABB became convinced that it simply could not go forward with the development, and that Britestarr had to provide assurances that it could convey title to the Property to ABB.

Soon after ABB began its investigation of Britestarr and Norkin, it contacted Piper and Norkin to obtain copies of various corporate and financial documents relating to Britestarr's corporate structure and its ownership of the Property, particularly the share certificates. These requests were made orally initially and in writing in November 2000.

Piper and Norkin refused to comply with ABB's requests and refused to produce any of the requested documents, responding that ABB did not "need" any of these documents. Faced with threats to Britestarr's ability to perform its obligation to convey title to the Property or to ABB in accordance with the Option Agreement, ABB had reasonable grounds to believe that Britestarr would be unable to perform its obligation to deliver the Property to ABB in accordance with the Option Agreement.

ABB therefore exercised its rights under New York law to seek reasonable assurances from Britestarr of its ability to perform its fundamental obligations under the Option Agreement. Specifically, ABB sought assurances in the form of forbearance agreements to be entered into by Britestarr with each of the major creditor groups pursuant to which such creditors would suspend any action which might interfere with Britestarr's ability to convey title to the Property to ABB in accordance with the Option Agreement.

Norkin, by letter dated December 2, 2000, declined to provide any adequate assurances and demanded that ABB fully comply with all of its obligations under the Option Agreement without any further assurances. Rather than follow through on Britestarr's obligations to ABB and put Britestarr on the road to earning hundreds of millions of dollars, Piper and Norkin kept taking ABB's option payments and refusing to help ABB sort out Britestarr's financial situation. It was clear that until such assurances were provided, ABB could never obtain financing to build the power plant. Yet, Piper and Norkin refused to assist in obtaining assurances. Accordingly, ABB ceased permitting the project in October 2000. Thus, Piper and Norkin obstructed the development of the plant, resulting in a loss of money for Britestarr. In compliance with the option agreement, ABB subsequently paid Britestarr the full amount of the outstanding Option Payments and took various steps to

protect its interests.  Friema Norkin owned Britestarr from its creation in 1986 to the present.  Norkin was simply the president of Britestarr.  Yet, Piper released over $1,000,000 of Britestarr's money from the trust account to Norkin upon Norkin's request. With its cash assets gone, Britestarr was helpless in dealing with its creditors.  On December 27, 2000, a judgment was entered in the Foreclosure Action in favor of Galea & Kruse.  The judgment established a debt of $1,243,101 and directed the foreclosure sale of the Oak Point Site.

On January 9, 2001, ABB wrote to Matthew K. Beatman, Norkin's bankruptcy counsel and offered to provide no less than $400,000 in addition to the option payments to resolve the issues in the Norkin bankruptcy and reorganize Norkin's financial affairs.  On February 21, 2001, Galea & Kruse agreed to forebear its foreclosure rights in exchange for $275,000 in payments from ABB.

Despite the assistance offered by ABB, Piper and Norkin continued to refuse to provide ABB with the assurances it needed to continue permitting the property.  On March 13, 2001, ABB commenced an action against Britestarr seeking adequate assurances of Britestarr's ability to perform under the Option Agreement and additional time to complete its investigation of the Oak Point Site, claiming that involvement with extraneous issues and litigation prevented it from completing its investigation within the option period.  Norkin and Piper contested ABB's right to seek adequate assurances.

The Supreme Court of the State of New York entered a temporary restraining order prohibiting Britestarr from marketing the Oak Point Site to any party other than ABB.  But, Piper and Norkin violated the order.  Beginning at least in March 2001, Piper and Norkin worked together to obstruct ABB's performance of the Option Agreement by marketing the

property to Mirant.  On March 14, 2001, despite knowing that an injunction was in place, Piper and Norkin met with Mirant to negotiate an agreement for Mirant's purchase of the Oak Point Site.  In a letter, Kenneth Willig ("Willig") admits to having been informed of a "Yellowstone injunction" and being told that a meeting between Norkin and Mirant would be inadvisable.  Despite this knowledge, Piper participated in the meeting and, based on information and belief, assisted Norkin in negotiating with Mirant.  Piper and Norkin caused Britestarr to violate a direct court order.

Given the publicity surrounding Norkin, it is unlikely that Piper did not understand that Norkin was a threat to Britestarr from the beginning.  However, it is clear that Piper became concerned about Norkin in 2001.  In the same letter, Willig claims to be distressed about not having received "accurate or complete information" from Norkin or Mitch Fenton ("Fenton"), a Piper partner who later joined Buchanan Ingersoll.  So, without question, as of at least March 14, 2001, Piper is on notice that Norkin is placing Britestarr in jeopardy and may not be conveying complete and accurate information to Piper.  Despite this knowledge, Piper transferred another $628,000 held in trust for Britestarr to Norkin.

Working behind ABB's back, Piper and Norkin continue to attempt to market the Oak Point Site to Mirant through 2001, while accepting ABB's option payments and distributing them to Norkin for his personal use.

After receiving the restraining order from Fenton, David Langlois ("Langlois") reviewed the documents and prepared a memorandum to Willig and Dean Collucci ("Collucci") (the "Langlois Memo").  In the memo, Langlois stated:

> I reviewed [the documents] we received yesterday from Mitch Fenton . . . Reference was made in a number of papers to the personal bankruptcy of David Norkin filed in November 2000 . . . My principle concern is that . . . we

> we have been receiving funds and distributing funds to David Norkin. Arguably those funds belong to his bankruptcy estate. We have no way of knowing if we are somehow violating a court order or assisting in an evasion of a bankruptcy court order. If so, David could be involved in bankruptcy fraud.

Despite knowing that Norkin was in personal bankruptcy and that it could be assisting in bankruptcy fraud, Piper distributed $628,000 of Britestarr's funds to Norkin after the Langlois Memo was circulated. In fact, Langlois authorized a transfer of $10,000 the very next week.

Because of the obstruction by Piper and Norkin and the concurrent negotiations with Mirant, ABB was prevented from completing the deal with Britestarr and developing the project on schedule.

The ABB option agreement, which would have become the sales contract had Piper and Norkin not worked together to obstruct this deal, would have lead to a significant amount of money for Britestarr. Britestarr would have been entitled to approximately $225,000,000.00 over 30 years. But, instead of having hundreds of millions of dollars, Piper and Norkin led Britestarr to bankruptcy.

On March 22, 2002, the Internal Revenue Service (the "IRS") moved to dismiss the Norkin bankruptcy case, or, in the alternative, to convert the Norkin bankruptcy case to a case under Chapter 7 of the United States Bankruptcy Code. The bankruptcy was converted on May 23, 2002.

On May 20, 2002, acting through its then president, Norkin, and its legal counsel, Piper, Britestarr filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York even though Britestarr's creditors were not making any effort against Britestarr at the time. Piper

prepared Britestarr's bankruptcy schedules. They state that Britestarr had no cash and no bank accounts. Additionally, Britestarr's statement of financial affairs, again prepared by Piper, state that in the one year preceding the filing of Britestarr's bankruptcy petition, Britestarr paid Norkin $300,000. In fact, Piper paid Norkin $596,646.95, according to Piper's own trust account between June 26, 2001 and March 21, 2002. This is after Piper realized that any payments to Norkin could be assisting him in committing fraud against the Bankruptcy court.

On June 18, 2002, Friema Norkin and Ronald I. Chorches, the trustee appointed to oversee the Norkin estate (the "Trustee"), resolved to remove Norkin as a director of Britestarr and removed him as president. Steve Smith ("Smith") took over as the sole director and president of Britestarr.

That day, Smith ordered Piper to consent to the transfer of Britestarr's bankruptcy case from the Southern District of New York to the District of Connecticut. Despite this directive from the president of its client, Piper opposed the transfer at Norkin's request. In doing so, Piper demonstrated that its loyalty lay, as it always had, not with Britestarr, but with Norkin.

Before Britestarr filed for bankruptcy, none of Britestarr's creditors were acting against it. That changed when Piper inadvisably put Britestarr into bankruptcy. On November 14, 2002, the DEC filed a claim against Britestarr's bankruptcy estate for $17,777,500. The New York City Department of Finance filed a proof of claim against the bankruptcy estate for $10,379,392 plus interest. The City of New York claims liens on the Oak Point Site for unpaid real estate taxes from 1988 to 2003, inclusive. Piper filed a claim in the amount of $240,000.

**III.**
**ARGUMENT**

By statute, all cases related to a case arising under title 11 may be referred by rule

to the bankruptcy court. 28 U.S.C. § 157(a). By order dated September 21, 1984 of the

United States District Court for the District of Connecticut, all bankruptcy cases were

referred to the Bankruptcy Court. 28 U.S.C. § 157(a) provides for a mechanism whereby

the district court can withdraw the reference to the bankruptcy court. 28 U.S.C. § 157(d).

The statute provides in relevant part:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any
> party, for cause shown.

Withdrawal of the reference should be used in narrow circumstances. Otherwise,

the exception would swallow the rule. Consequently, discretionary withdrawal[1] of the

reference should not be granted absent exceptional and compelling circumstances. *In re*

*Onyx Motor Car* Corp., 116 B.R. 89 (S.D. Ohio 1990); In *re DeLorean Motor Co.*, 49 B.R.

900 (E.D. Mich. 1985).

**A.     The Withdrawal Issue is not Ripe.**

Before addressing the merits of Piper's withdrawal motion, this Court must first

consider whether Piper's Withdrawal Motion is ripe for consideration. Britestarr contends

that this issue is not yet ripe for consideration because this case is not yet ready for trial.

---

[1]Withdrawal of the reference may be either mandatory or permissive pursuant to 28 U.S.C. §
157(d). Withdrawal is mandatory when the resolution of a proceeding will require "significant
interpretation" of non-bankruptcy federal law. *See Official Comm. of Unsecured Creditors of Enron Corp.*
*v. Lay*, 295 B.R. 21, 25 (S.D.N.Y. 2003). Where withdrawal of the reference is not mandatory, the court
still has discretion to withdraw the reference for "cause" on its own motion, or upon a timely motion by any
party. 28 U.S.C. § 157(d). In the instant case, mandatory withdrawal is not applicable and, as discussed
herein, Piper has failed to demonstrate that cause exists for discretionary withdrawal of the reference.

In fact, the parties are just now beginning comprehensive discovery. Consequently, this Court should deny Piper's motion without prejudice to its reconsideration when this case is ready for trial.

A motion to withdraw the reference is not ripe for decision until the case is trial ready. *See e.g., Hayes v. Royala, Inc.*, 180 B.R. 476 (E.D. Tex. 1995) (district court denied withdrawal of reference motion as premature upon finding that plaintiff in the case did not have a choate right to jury trial unless and until the time of trial). Rather, the appropriateness of removal of the case to a district court is a question that only becomes ripe for determination if and when the case is ready for trial. In *re Adelphi Institute, Inc.* 112 B.R. 534, 538 (S.D.N.Y. 1990). The bankruptcy court is able and in the best position to preside over adversary proceedings and adjudicate discovery disputes and motions. *In re Lands End Leasing Inc.*, 193 B.R. 426, 436 (D.N.J. 1996). Because the bankruptcy court is equipped to proceed with the adversary proceeding until the issues are ripe for submission to the jury, this Court should deny the motion to withdraw the reference as premature. *In re Keene Corp.*, 182 B.R. 379, 385 (S.D.N.Y. 1995).

The rationale for withholding a ruling on the motion to withdraw until the case is ready for trial has been expressly accepted by the Second Circuit. *In In re Orion Pictures Corp.*, 4 F.3d 1095, 1102-03 (2nd Cir. 1993). The Court acknowledged that a district court might decide that a case will require extensive discovery and oversight before trial, making it better to leave the case before the bankruptcy court until the case is ready for trial. *Id.* The Court stated:

> If a case is non-core and a jury demand has been filed, a district court might find . . . cause to withdraw the reference. However, a district court also might

decide that a case . . . will require <u>protracted discovery and court oversight</u> before trial . . . and <u>therefore might conclude that the case at that time is best left in the bankruptcy court</u>.

*Id.*

This case is in its infancy. Piper has not yet filed a responsive pleading and discovery is just getting underway. Consequently, Britestarr asks that this Court deny Piper's motion until such time as the case becomes trial ready.

**B.    Piper Waived its Right to Seek Withdrawal.**

As another threshold issue, this Court should deny Piper's motion because Piper has waived its right to complain about the bankruptcy court's jurisdiction by filing a proof of claim. Piper served as Britestarr's legal counsel. During that time, it never sent a bill to Britestarr. Yet, now, it claims to be owed $240,000 in legal fees. To recover the fees, Piper filed a proof of claim against Britestarr's bankruptcy estate.

Piper's filing of a proof of claim results in a waiver of its right to seek withdrawal of the reference. Courts have found that withdrawal is not appropriate where the party moving for withdrawal made claims in the bankruptcy court. *In re TPI International Airways*, 222 B.R. 663 (S.D. Ga. 1998); *In re Beeline Eng'g & Constr., Inc.*, 154 B.R. 790, 793 (S.D. Fla. 1993). In this case, when Piper filed its proof of claim against Britestarr, it submitted to the jurisdiction of the bankruptcy court. In doing so, it waived its right to seek a withdrawal of this action. For this further reason, Britestarr respectfully submits that this Court should deny Piper's motion.

**C.    Factors for Consideration Weigh in Favor of Denying Motion.**

Even assuming that this Court decides to consider the merits of Piper's withdrawal request, the Withdrawal Motion should still be denied because the factors to be considered

for withdrawing the Adversary Proceeding weigh heavily in favor of leaving this matter in the bankruptcy court.

The burden of demonstrating cause to withdraw the reference rests on Piper. Yet, not only has Piper failed to explain why the Second Circuit factors for deciding this issue are in its favor, it has also failed even to discuss the factors. In the Second Circuit, there are five non-exclusive factors to be considered when a district court is deciding whether to exercise its discretion to withdraw the reference to the bankruptcy court: (1) whether the claim is core or non-core, (2) judicial efficiency, (3) delay and costs to the parties, (4) what will promote uniformity of bankruptcy administration, and (5) what will prevent forum shopping. *Orion*, 4 F. 3d 1095 at 1102-03. Each of these factors suggest that this Court should deny Piper's motion and leave this Adversary Proceeding in the Bankruptcy Court.

1.  **Core v. Non-core**

The Adversary Proceeding is a core proceeding. At a hearing before the Bankruptcy Court on August 5, 2003 (the "August 5th Hearing"), the parties agreed that the claims asserted by Britestarr against Piper are counterclaims to Piper's proof of claim. 28 U.S.C. §157(b)(2)(c) provides that "counterclaims by the estate against persons filing claims against the estate's" are core proceedings.

In addition, Britestarr's claims are core claims because of their significance to the administration of the estate. Britestarr's claims against Piper relate to Britestarr's only real property asset -- the Oak Point Site -- and the claims themselves represent one of Britestarr's most valuable asset. Because the claims are integral to the bankruptcy court's ability to administer the estate, the claims are core.

The core versus non-core distinction had its genesis in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, where the United States Supreme Court struck down provisions of the 1978 Bankruptcy Act. 458 U.S. 50 (1982). The Supreme Court held that the statute improperly allowed Article I bankruptcy courts to hear "non-core" proceedings that, without consent of the parties, constitutionally could only be heard by Article III courts. The plurality stated that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Id.* at 71.

The Second Circuit holds that the term "core proceedings" should be broadly interpreted by lower courts. *In re U.S. Lines, Inc.*, 197 F.3d 631 (2nd Cir. 1999). Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function. *Id.* A core bankruptcy function of particular importance here is "plac[ing] the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors." *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 91 (2d Cir.1988).

Claims involving the most important assets of the debtor are core proceedings because they directly affect the ability of the bankruptcy court to allocate the assets of the debtor among the creditors. *In re U.S. Lines, Inc.*, 197 F.3d 631, 635 (2nd Cir. 1999) (holding that indemnity contract claims were core proceedings because of the significant impact on the administration of the estate). This is to be distinguished from claims that

would only augment the assets of the estate.  *Id.*  The claims against Piper and the value of the Oak Point Site are unquestionably the two largest assets of Britestarr's estate. Clearly this Adversary Proceeding is more than merely an augmentation of the debtor's estate.

Resolving the disputes over the two largest assets of the debtor have a direct impact on the core administrative functions of the bankruptcy court.  The value of the Oak Point Site and the claims against Piper represent the only source of funds to pay Britestarr's creditors.  Consequently, this Court should find that the Adversary Proceeding is a core proceedings.

2.    **Efficiency of Judicial Resources**

Keeping the Adversary Proceeding in the Bankruptcy Court would be the most efficient use of judicial resources.  The Bankruptcy Court has experience with the facts, transactions, and parties to this suit.

Piper implies incorrectly that the Bankruptcy Court is new to this case.  While it is true that the Adversary Proceeding was filed in August 2003, the underlying Chapter 11 case has been pending before the bankruptcy court for over sixteen months.[2]  Since that time, the parties to this Adversary Proceeding have been before the Bankruptcy Court numerous times, including in connection with their litigation over Piper's proof of claim. Accordingly, the Bankruptcy Court has had significant experience with, and exposure to, the parties to this Adversary Proceeding.

_____

[2]Britestarr's Chapter 11 proceeding commenced in the Bankruptcy Court when Britestarr filed for bankruptcy protection on May 20, 2002.  Piper, then Britestarr's counsel, commenced Britestarr's Chapter 11 case by filing a bankruptcy petition in the Southern District of New York.  Judge Shiff became involved when the case was transferred to Connecticut on June 18, 2002.

Given the Bankruptcy Court's knowledge and experience, withdrawing the reference to this case would be inefficient, requiring this Court to duplicate the Bankruptcy Court's knowledge and experience. This is the precise justification relied upon by other courts to deny motions to withdraw. For example, in *In re Ponce Marine Farm, Inc.*, the court stated,

> First, the Court notes that the chapter 11 cases have been in the bankruptcy court for over a year and a half. A withdrawal of the reference from the bankruptcy court at this time would surely result in delay of the case's progression. Second, the bankruptcy court is quite familiar with the circumstances surrounding [the parties]. Requiring this Court to come up to speed would surely be a waste of judicial resources. It would also place an unnecessary burden on the debtors.

172 B.R. 722, 724 (D. Puerto Rico 1994).

The court in *Ponce Marine* denied the motion to withdraw the reference, finding that the movant had failed to demonstrate cause for the withdrawal. *Id.* The facts underlying Piper's Withdrawal Motion similarly suggest that the motion should be denied.

In addition to the Bankruptcy Court's experience, withdrawing the reference would undo efficiency measures put in place by that Court. At the August 5th Hearing, the Bankruptcy Court established the procedure going forward for both the adversary proceeding and Piper's claim against Britestarr for fees. In addition, at this hearing, the Bankruptcy Court indicated its intention to consolidate the discovery in the Adversary Proceeding with the discovery surrounding Piper's claim for fees. If this Court withdraws the reference, this Court will in essence, be bifurcating the Adversary Proceeding from the Piper proof of claim, potentially resulting in a duplication of efforts by this Court and the bankruptcy court.

3. **Delay and Costs to the Parties**

Withdrawing this case from the Bankruptcy Court would cause delay and increased costs to the parties. As discussed above, the Bankruptcy Court has already consolidated Piper's claim and Britestarr's adversary proceeding, including consolidating discovery in both proceedings. This will allow all discovery disputes and all other hearings relating to either Piper's claim or Britestarr's Adversary Proceeding to be ruled on jointly. To split these two claims by withdrawing the reference could require multiple hearings on single issues, which will increase the costs to both parties.

Also, as discussed above, the Bankruptcy Court has significant knowledge about the facts, transactions, and parties. Requiring this Court to obtain the same experience and knowledge will require the parties to prepare significant briefing. Additionally, with each ruling made in each court, the parties will have to work to ensure that both courts are kept informed of the rulings of the other court. Withdrawing the reference to the bankruptcy court will inevitably increase the costs associated with these claims because of this duplication.

4. **Uniformity of Bankruptcy Administration**

The administration of Britestarr's bankruptcy estate can be most uniformly handled if these claims remain in the Bankruptcy Court. As discussed above, the Adversary Proceeding relates directly to the only real property asset of Britestarr and is itself a significant asset of the estate. The administration of the estate will hinge on the results of these claims and the value of the Oak Point Site. Clearly, the administration of Britestarr's

bankruptcy estate is best served by the Bankruptcy Court presiding over these related claims.

5.   **Prevention of Forum Shopping**

There is no question but that Piper -- having invoked the jurisdiction of the Bankruptcy Court by filing a proof of claim --- is now backpedaling furiously in order to avoid the consequences of its own actions.

Piper is allegedly attempting to protect Britestarr's right to a jury trial. Allowing them to use this as a basis for removal, while at the same time purporting to be a creditor in the Bankruptcy Court, is precisely the type of procedural maneuvering that this factor was intended to stop. Piper has filed a claim against Britestarr. By filing its proof of claim, Piper submitted to the jurisdiction of the bankruptcy court and waived its right to a jury trial. *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990). Permitting Piper to obtain a withdrawal of the reference by relying upon *Britestarr's* right to a jury trial simply flies in the face of that rule of law. Britestarr respectfully submits that Piper's blatant forum shopping should not be countenanced by this Court.

## IV.
## CONCLUSION

Piper asks this Court to withdraw the reference of this matter to the bankruptcy court. This Court should refuse to do so and deny Piper's motion because:

1.   the issue of withdrawal is not yet ripe;

2.   Piper waived its right to seek withdrawal by filing a proof of claim in the Britestarr Chapter 11 case; and

3.      Piper has failed to demonstrate cause for discretionary withdrawal of the reference.

WHEREFORE, Britestarr respectfully requests that Piper's Withdrawal Motion be denied in all respects and further seeks any and all such further relief to which it is entitled.

Dated: October 22, 2003

Respectfully submitted,

_Michael Caddell/CB_

Melissa Zelen Neier
CT25055
Justin Blackhall
CT24781
Ivey, Barnum, & O'Mara
170 Mason Street
Greenwich, Connecticut 06830
Phone: 203-661-6000
Fax:203-661-9462
Counsel for Plaintiff

Michael A. Caddell
SBT No. 03576700
Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010-3027
Telephone: 713.751.0400
Facsimile: 713.751.0906

ATTORNEY-IN-CHARGE FOR PLAINTIFF
Appointed as Special Litigation Counsel
on June 2, 2003.

OF COUNSEL:

Cynthia B. Chapman
SBT No. 007963339
Charles D. Brown
SBT No. 24026966
Admitted Pro Hac Vice October 8, 2003
Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010-3027
713.751.0400 Telephone
713.751.0906 Facsimile

## CERTIFICATE OF SERVICE

I certify that on October 21, 2003, I served a true copy of the foregoing document on the following counsel of record by certified mail, return receipt requested:

William S. Fish, Jr.
Tyler Cooper & Alcorn, LLP
185 Asylum Street
CityPlace I - 35th Floor
Hartford, CT 06103-3488

*Attorney for Defendant Piper Rudnick, LLP*

James P. Ulwick
Kramon & Graham, P.A.
One South Street - Suite 2600
Baltimore, Maryland 21202-3201

*Attorney for Defendant Piper Rudnick, LLP*

_____
Michael A. Caddell